UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

97 DEC -1 PM 3: 56

U.S. DISTRICT COURT
N.D. OF ALABAMA

GARY C. WINTON,

    Plaintiff(s),

    vs.

GENERAL MOTORS
CORPORATION,

    Defendant(s).

]
]
]
]
]
]
]
]
]
]

CV-96-N-1043-NE

ENTERED

DEC 1 1997



### Memorandum of Opinion

In this action for employment discrimination, the plaintiff, Gary J. Winton, ("Winton"),

brings suit against his former employer, General Motors Corporation ("GM"), pursuant to

the following: (1) Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C. § 2000e

*et seq.* ("Title VII"); (2) 42 U.S.C. § 1981 ("§ 1981"); (3) the Age Discrimination in

Employment Act ("ADEA"); 29 U.S.C. § 216, *et seq.*; and (4) the Americans with Disabilities

Act ("ADA"); 42 U.S.C. § 12111, *et seq. Second Amended Complaint*, filed Nov. 22, 1996;

*Transcript of Hearing on Motion to Dismiss*, Jan. 27, 1997. Specifically, Winton, an African-

American male over forty years of age with a "heart condition," claims alterations in the

terms and conditions of his employment when GM transferred him, wrongful termination,

failure to rehire and retaliation based upon race, age and disability.[1] *Id.* The court has

---

[1] Ever since Winton's first complaint, filed April 23, 1996, the court struggled to clarify Winton's claims. On August 26, 1996, the court ordered Winton to file an amended complaint, which alleges every claim he has against GM. On August 12, 1996, Winton filed his amended complaint, and on November 4, 1996, the court granted GM's motion to dismiss for failure to state a cognizable claim, without prejudice and with the right to amend the amended complaint within fifteen days. On November 22, 1996, Winton filed a second amended complaint, and on January 27, 1997, the court held a hearing on GM's motion to dismiss the second amended complaint, in order to try to clarify Winton's claims. *Transcript of Hearing on Motion to Dismiss*, Jan. 27, 1997.

In that hearing, Winton specifically stated that his termination and GM's refusal to rehire are the only

previously dismissed Winton's claims of gender discrimination and conspiracy. *Order*,

entered Feb. 21, 1997.

The matter is presently before the court on the defendant's motion for summary

judgment, filed July 1, 1997.[2] The parties fully briefed the motion, the court heard oral

arguments, and the motion is ripe for decision. Upon due consideration, it will be granted.

## I. Statement of Facts.[3]

Winton is a forty-three-year-old African-American male.[4] *Winton Affidavit I*[5] at ¶ 4.

On May 16, 1994, GM hired Winton as a "per diem" supervisor at its Delphi Saginaw

Steering Gear Systems plant.[6] Winton's per diem position is a temporary supervisory

---

adverse employment actions of which he complains. *Id.* at 9, 14, 18, 21. However, Winton also complained of "the facts and circumstances leading up to the sixteenth of May, up until which time I was terminated." *Id.* at 6. Nevertheless, in order to extend complete deference to the inartful pleading of this *pro se* plaintiff, the court will assume that Winton might also consider his transfers to various departments before his discharge as an adverse employment action.

Furthermore, in the interest of addressing every conceivable claim in this lawsuit, so that Winton will not be prejudiced by his *pro se* status, the court will also consider whether Winton's discharge and GM's subsequent refusal to rehire Winton could have been in retaliation for a complaint of employment discrimination, notwithstanding the fact that Winton has never articulated such a claim for retaliation.

[2] In a related matter, the court has for consideration defendant's motion to strike portions of plaintiff's affidavit and evidentiary submissions, filed September 30, 1997. The court will consider this matter contemporaneously with the motion for summary judgment and will disregard any portions of the plaintiff's evidence not properly before the court on summary judgment.

[3] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[4] Winton testifies, and GM does not refute, that his date of birth is August 25, 1954. *Winton Affidavit I* at ¶ 4.

[5] Winton submitted two affidavits in opposition to GM's motion for summary judgment: *Affidavit I*, filed July 25, 1997, as a part of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, and *Affidavit II*, filed September 17, 1997, which is subject to GM's motion to strike, filed September 30, 1997.

[6] Winton claims that he was qualified for the position of per diem supervisor for the following reasons: (1) "outstanding education and work related experience," which included three graduate degrees, a Master of Science Degree in Physical Education from Indiana University, a Masters of Art Degree in Criminal Justice from

2

position with no employee benefits such as vacation, sick leave, or medical insurance. However, per diem supervisors, who are paid by the hour, have the same job duties as permanent supervisors, which include overseeing hourly employees and production in the various manufacturing departments to which they are assigned. In general, GM selects its permanent, salaried supervisors from the pool of per diem supervisors.

According to GM, if a per diem supervisor wishes to take several days off from work, company policy requires that he or she must first notify his or her immediate supervisor to obtain permission.[7] Winton, testifying at his unemployment benefits hearing, admitted that he knew that he should have coordinated leave with his immediate supervisor. *Winton v. General Motors Corp.*, CV-95-292, trial transcript (*Winton Testimony*) at 50 (Cir. Ct. Morgan Co., Ala. Jan. 29, 1997). However, Winton testified in opposition to GM's motion for summary judgment that, on December 30, 1994, his brother, Nathaniel Winton, a permanent supervisor at the same GM facility, substituted for him,

---

John Jay College of Criminal Justice, and a Masters of Art Degree in National Security and Strategic Studies from the Naval War College, Newport , Rhode Island, June 1991; (2) over 14 years of successful active and passive supervisory and management experience; (3) a management philosophy that "parallels tenants of Total Quality Management;" (4) he "developed several projects from formulation to execution to evaluation;" (5) his "capabilities allowed for the most efficient handling of a myriad of projects under the most arduous of circumstances with little or no guidance;" (6) he possesses "exceptional analytical, communicative and presentation skills; (7) he has managed from five to 275 persons; (8) during his 14 year period of active military service in the Regular Army as a Major in the Military Police Corps, he was accorded three meritorious Service Medals, a Top Secret clearance and an Honorable Discharge. *Winton's Affidavit I* at ¶ 5.

    Although GM disputes this claim, it offers no evidence to the contrary. *Defendant's Reply Submission in Response to Exhibit D of the Court's Order* at 6. Instead, GM argues that this claim is due to be stricken because it is partially based upon "speculation and conjecture," it is unsupported by evidence in the record and it is presented in such a way as to violate Exhibit D of the Court's Order. *Id.*

[7] Winton testifies. "There are no policies or directives which governs [sic] per diem supervisors." *Winton Affidavit II* at ¶ 8. On the other hand, Harry L. Fuller, GM Human Resources Manager, testifies, "It is an unwritten policy at the Delphi Saginaw plant that supervisors, both permanent and per diem, who wish to take time off from work must first notify their immediate supervisor to obtain permission. *Fuller Declaration* at ¶ 4.

working the "B" shift in Departments 34, 35, 36 and 38, without prior coordination with the lead supervisor or the area manager. *Winton Affidavit I* at ¶ 35.

Per diem supervisors are rotated among the various departments at GM to expose them to the entire manufacturing process. *Winton Deposition* at 269. As a per diem supervisor, Winton was initially assigned to Departments 30 and 47, which machined rack and pinion parts, under the supervision of white Area Manager Wayne Loosier ("Loosier"). *See Winton Deposition* at 227. Winton alleges that, on June 23, 1994, he received a one month rating that was, according to Loosier, "comparable to what he would give to his more senior, tenured, permanent supervisors."[8] *Winton's Affidavit I* at ¶ 11.

Before coming to work for GM, Winton had served in the Army's military police force for years, and according to GM, while working in the rack and pinion area, Winton's style of supervision was similar to that which he had used in the military. *Wright Deposition* at 10; *Nathaniel Winton Deposition* at 19. His style, according to GM, did not sit well with several hourly union employees. *Wright Deposition* at 10; *Nathaniel Winton Deposition* at 19. Specifically, several employees complained to Superintendent Chris Spann about Winton's "bird dogging" or constant monitoring of their work activities. *Winton Affidavit II* at ¶ 17. Winton claims that most, but not all of those who complained were white. *Winton Affidavit I* at ¶ 16.

Winton recites a myriad of comments allegedly made by GM employees during his tenure in the rack and pinion department. Winton quotes Larry Brown, Department 30 "C"

---

[8] GM disputes this alleged fact, but offers no evidence to the contrary. *Defendant's Reply Submission in Response to Exhibit D of the Court's Oder* at 7. Instead, GM asserts that the alleged statement by Loosier is "taken out of context." *Id.*

4

shift Car Chucker Operator, whose race Winton does not specify, as saying, "Nobody likes you, Gary." *Id.* at ¶ 14. Winton quotes Kim Redding, allegedly white[9] Olofsson Operator, responding to the complaints of others about Winton, as saying, "When are we going to get rid of the motherfucker?" *Id.* at ¶ 19. According to Winton, Bobby Moore, who is allegedly black,[10] warned Winton, without further explanation, "You are going to see your productivity diminish." *Id.* at ¶ 20. Winton claims that Mike Chapman, Department 30 "C" shift Car Chucker Operator, whose race Winton does not specify, said, "We are going to run you off." *Id.* at ¶ 25. Upon giving directions about how to perform his duties to Carl Jarrett, Department 47 "third" shift Jobsetter/Material Handler, Winton claims Jarrett, whose race Winton does not race specify, said, "You are not my supervisor, boy." *Id.* at ¶ 23. Winton claims that "Mr. McNeese," whose race Winton does not race specify, threatened him saying, "You are going to get your brother killed." *Id.* at ¶ 26. In his support, Winton claims that "Ms. Rose," Department 47 Welder, whose race Winton does not specify, in a department meeting, said, "All he was trying to do was to get them to do their job." *Id.* at ¶ 18.

In October, 1994, notwithstanding Winton's conflict in the rack and pinion area, GM reassigned him to the pump area to give him a fresh start supervising a new group of employees. *Wright Deposition* at 10. According to Winton, in October 1994, Loosier told Winton about his transfer, saying, " You don't want to stay in these Departments for an

---

[9]Winton testifies that Redding is white. *Winton Affidavit I* at ¶ 19. GM proffers no evidence to the contrary.

[10]Winton testifies that Moore is black. *Winton Affidavit I* at ¶ 20. GM proffers no evidence to the contrary.

extended period of time," and saying that the transfer would allow him to "become familiar with all aspects of the operations because of his experience and education." *Winton Affidavit I* at ¶ 29. Winton testifies that, around October 31, 1994, he asked Harry Fuller ("Fuller"), GM Human Resources Manager, at the conclusion of the Manufacturing Supervisor's Training Course, why he was transferred. *Id.* at ¶ 30. According to Winton, Fuller, a white[11] male, looking in the direction of Dick McIntyre, GM Site Manager, made a motion across his throat "as if doing so with a knife." Winton construed this to mean "cut his throat." *Id.* at ¶ 30. Winton also testifies that Tim Clark, an allegedly black twenty-six year-old,[12] replaced him in the rack and pinion area. *Id.*

After his reassignment to the pump area, Winton describes comments allegedly made by GM employees. Winton testifies that during the month of November 1994, Marjorie Smith, whose race Winton does not specify, said, "You are going to be in for a rude awakening," and Ms. Collins, in Payroll and Disbursement, said "they decided . . . don't fight over money." *Id.* at ¶ 31. Winton also testifies that on December 10 or 17, 1994, during lunch at the Harvest Buffet restaurant, with Leonard Robinson, Tim Clark, Roger Williams and Nathaniel Winton present , Williams, whose race Winton does not specify, asked Winton, in effect, "to step down and let Nat take over" because Nathaniel Winton "had more connections in North Alabama." *Id.* at ¶ 33. Winton also testifies that around December 18, 1994, Dillard Hall, Third Shift Supervisor of Departments 34, 35, 36 and 38,

---

[11] Winton testifies that Fuller is white. *Winton Affidavit I* at ¶ 30. GM proffers no evidence to the contrary.

[12] Winton testifies to Clark's age and race. *Winton Affidavit I* at ¶ 30. GM proffers no evidence to the contrary.

6

whose race Winton does not specify, said, "He doesn't know when to quite [sic] does he?" *Id.* at ¶ 34. Finally, Winton testifies that, during a discussion with Phillip Hodges in December 1994, Third Shift Committeeman for Departments 34, 35, 36 and 38 third shift, whose race Winton does not specify, disclosed that "your (Winton's) brother was behind the activities of the union." *Id.* at ¶ 37.

In early January, 1995, GM reassigned Winton to Departments 80, 81, and 31, an area that machined valves, because the Area Manager, Mark McClanahan ("McClanahan"), needed an additional per diem supervisor. Winton testifies that Kerry Wright ("Wright"), allegedly white[13] Area Manager, advised him that "this move was made because of seniority reasons." *Winton Affidavit I* at ¶ 36. According to Winton, "a younger, less experienced supervisor, Kent Bevil-White, 27 years old, was elected in an adjacent position." *Id.* Winton does not specify Bevil-White's race. Winton also testifies that on December 31, 1994, Harold Davis, Department 30 Material Handler, whose race Winton does not specify, said, regarding Winton's transfer, that this is the "last stop before heading out the door." *Id.* at ¶ 38.

The morning after Winton worked his first 11: 00 p.m. to 7: 00 a.m. shift in the valve department, McClanahan met with Winton to discuss job duties, identify experienced supervisors in the area who could assist Winton, and give Winton his phone number in the event he had problems or questions. *Winton Deposition* at 251-52.

---

[13] Winton testifies that Wright is white. *Winton Affidavit I* at ¶ 36. GM proffers no evidence to the contrary.

7

Winton did not appear for his scheduled shift on January 5, 1995. Winton testifies that he went to Alexandria, Virginia "to file a complaint in the District Court for the Northern District of Virginia." *Winton Affidavit I* at ¶ 39. According to Winton, he received a letter from the Equal Employment Opportunity Commission ("EEOC") on October 6, 1994, and "the 90 day period for filing [his] claim was rapidly drawing to a close." *Id.*

When McClanahan arrived for work at 6:30 a.m. on January 6, 1995, he learned that Winton had not shown up for work. Winton did not give McClanahan any advance notice about his absence, nor did he request permission to take any type of leave. *Id.* at 283; *Winton*, CV-95-292, *Winton Testimony* at 26. Winton testified that he did tell two permanent supervisors, Nathaniel Winton and Roger Williams, and that they assured him that "coverage would be provided." *Winton*, CV-95-292, *Winton Testimony* at 26; *Winton Deposition* at 260; *Winton Affidavit II* at ¶ 39. However, Winton acknowledge that he did not instruct his fellow supervisors to relay a message to McClanahan about his absence, nor did he instruct them to inform McClanahan that his absence was to file a race discrimination complaint. *Winton*, CV-95-292, *Winton Testimony* at 51-53.

Winton did not return to work for more than a week and did not contact McClanahan in the interim to explain his continued absence. *Winton Deposition* at 283, 260-61; *Winton*, CV-95-292, *Winton Testimony* at 28, 31-32, *McClanahan Testimony* at 90. Winton testified that, on his third day of absence from work, he attempted to call McClanahan, but "the phone rang and rang" and "there was no answering machine." *Winton Deposition* at 260; *Winton Affidavit I* at ¶ 40; *Winton Affidavit II* at ¶ 39. Winton also testified that he did not

8

have McClanahan's voice mail number, which McClanahan gave to Winton on his first day in the valve department. *Winton Deposition* at 260.

GM claims that Winton's absence disrupted the operations and production in his departments. Winton admits that an absence requires "juggl[ing] or realignment of the shift in order to cover that time period in my absence." *Winton*, CV-95-292, *Winton Testimony* at 63. Winton's absence forced McClanahan to pull supervisors from other departments to perform Winton's job duties.[14] *Winton*, CV-95-292, *McClanahan Testimony* at 87-88, *Fuller Testimony* at 70-76, 91-92.

After Winton failed to appear for work on January 6, McClanahan contacted Winton's brother, Nathaniel Winton. *Nathaniel Winton Deposition* at 35; *Winton*, CV-95-292, *McClanahan Testimony* at 89-90. When McClanahan asked Nathaniel about his brother, Nathaniel responded that he had no knowledge of Winton's whereabouts.[15] *Winton*, CV-95-292, *McClanahan Testimony* at 90, *Nathaniel Winton Testimony* at 110; *McClanahan Declaration* at ¶ 4; *Nathaniel Winton Deposition* at 36-37; *Winton Affidavit II* at ¶ 40. Nathaniel Winton testifies that their father did not know Winton's whereabouts either. *Winton*, CV-95-292, *Nathaniel Winton Testimony* at 110; *Nathaniel Winton Deposition* at 36-37.

After Winton was absent several days, McClanahan informed Fuller. Based on Winton's ongoing and unauthorized absence, Fuller, Operations Manager Greg Henderson

---

[14] Winton disputes this fact, but offers no evidence to the contrary. *Plaintiff's Opposition to Defendant's Motion for Summary Judgment* at 11.

[15] Winton disputes this fact, but offers no evidence to the contrary. *Plaintiff's Opposition to Defendant's Motion for Summary Judgment* at 11.

9

("Henderson"), Product Manager Chris Spann ("Spann") and Personnel Director Larry Blaesing ("Blaesing") decided collectively to terminate Winton's employment.[16] *Fuller Declaration* at ¶ 7-8; *Winton*, CV-95-292, *McClanahan Testimony* at 91. Fuller sent Winton a letter informing him that his employment had been terminated. *Winton Deposition* at 282; *Fuller Deposition* at 13-15, Exhibit 1; *Winton*, CV-95-292, *Fuller Testimony* at 70; *Winton Affidavit I & II* at ¶ 41.

After receiving Fuller's letter, Winton returned to the plant to have his final pay voucher signed. *Winton Deposition* at p. 234; *Winton Affidavit I & II* at ¶ 42. While at the plant, Winton met with McClanahan, who took him to Fuller's office. *Winton Deposition* at 237, 243; *Winton*, CV-95-292, *McClanahan Testimony* at 93-95, *Fuller Testimony* at 71. Fuller asked Winton where he had been and why he had not reported for work. *Winton*, CV-95-292, *Fuller Testimony* at 71-72, *Winton Testimony* at 55. Winton responded that he had been attending to pressing personal legal matters, but would not provide any additional information. *Winton*, CV-95-292, *Winton Testimony* at 58-59, *Fuller Testimony* at 71-72; *Winton Affidavit I* at ¶ 46; *Fuller Deposition* at 18. Winton told Fuller that, prior to January 5, he had coordinated with his brother, Nathaniel Winton, and another one of GM's permanent supervisors, Roger Williams, telling them that he needed to be gone for a few days. GM claims that Winton did not ask his brother or Williams to relay a message to his Area Manager that he would be absent, nor did he inform them that he was going to

---

[16] Winton disputes this fact, but offers no evidence to the contrary. *Plaintiff's Opposition to Defendant's Motion for Summary Judgment* at 12.

file a race discrimination claim.[17] *Winton*, CV-95-292, *Winton Testimony* at 49-53, *Nathaniel Winton Testimony* at 106; *Winton Affidavit I* at ¶ 46; *Winton Affidavit II* at ¶ 43.

After hearing Winton's version of events, Fuller informed Winton that he would review the termination decision and would let him know the results within several days. Winton testifies that, on that same day, McClanahan inquired as to whether Winton could work that evening and Winton testifies that he agreed to work. *Winton Affidavit I* at ¶ 43. Also according to Winton, during this discussion with McClanahan, Winton "indicated that he needed a level playing field that was devoid of adverse union tactics and the sabotaging of parts or hiding of parts by employees." *Id.* Winton testifies that McClanahan agreed. Winton also testifies that he told Fuller about needing a "level playing field" and that Fuller agreed. *Id.* at ¶ 46.

Winton testifies that McClanahan said that "he knew what I (Winton) was doing," to which Winton testifies that he responded, "How did you know that's what I'm going to do?" *Id.* According to Winton, "for inexplicable reasons and out of the context with our conversation," McClanahan "indicated that he had a problem with color" and that "you (Winton) aren't going to get anything." *Id.*

Around this same time, Winton testifies that he discussed getting his job back with several employees at GM. According to Winton, he "coordinated with [Wright] so as to obtain a favorable collateral recommendation" and that Wright agreed. Id. at ¶ 44. Winton claims Wright "indicated that I (Winton) could work for his area on the weekends," but,

---

[17]Winton disputes this fact, but offers no evidence to the contrary. *Plaintiff's Opposition to Defendant's Motion for Summary Judgment* at 14.

11

without explanation, Wright said that "I was 'too off.'" *Id.* Winton also claims Floyd Blackwell, alleged black Superintendent of Plant 23, indicated that he wanted Winton to work in his Plant 23, but then Blackwell reneged on his offer. *Id.* Finally, Winton testifies that, on or about January 17 or 18, 1995, Nathaniel Winton "indicated that he (Nathaniel Winton) could get my (Winton's) job back." *Id.* at ¶ 47.

After meeting with Winton about his absence and termination, Fuller interviewed Nathaniel Winton and Roger Williams. They both denied that Winton had asked them to cover for him or informed them that he was going to be absent.[18] *Winton*, CV-95-292, *Fuller Testimony* at 77, *Nathaniel Winton Testimony* at 105, *Williams Testimony* at 100; *Nathaniel Winton Deposition* at 38-39; *Williams Deposition* at 13-14.    After conferring with Henderson, Spann, and Blaesing, Fuller wrote Winton a second letter, dated January 19, 1997, upholding the initial termination decision.[19] *Fuller Deposition* at 21-23, Exhibit 2; *Winton*, CV-95-292, *Fuller Testimony* at 75, 80-81.

GM defends its decision to terminate and to not rehire Winton with claims and evidentiary support as follows: (1) no one involved in the decision to terminate Winton mentioned or was even aware that his absence was due to his filing of a race discrimination action in northern Virginia; *Winton's Deposition* at 241-42, 259; *Winton*, CV-95-292, *Winton Testimony* at 47-48, 51-52, 65-66; *Fuller Declaration* at ¶ 12; *McClanahan Declaration* at ¶ 10; (2) no one involved in Winton's termination mentioned or was even

---

[18] Winton disputes this fact, but offers no evidence to the contrary. *Plaintiff's Opposition to Defendant's Motion for Summary Judgment* at 15.

[19] Winton disputes this fact, but offers no evidence to the contrary. *Plaintiff's Opposition to Defendant's Motion for Summary Judgment* at 15.

aware that Winton was forty  years old or that he had any type of disability;  *Fuller Declaration* at ¶ 13; *McClanahan Declaration* at ¶¶ 8-9; and (3) no per diem supervisor at the Delphi Saginaw plant, other than Winton, has ever failed to appear for more than one scheduled shift without obtaining prior approval. *Winton Deposition* at  284-85; *Fuller Declaration* at ¶ 14. Winton, in his opposition to GM's motion for summary judgment, disputes each of these claims, but offers no evidence to the contrary. *Plaintiff's Opposition to Defendant's motion for Summary Judgment* at 16. Rather, Winton states, "Additional discovery is needed."[20]  *Id.*  Winton admitted to the court, in his oral argument on this motion, that he is unaware of any per diem supervisor who ever missed more than one shift without permission.

In 1992, immediately prior to resigning his commission with the United States Army, Winton was diagnosed by Lt. Col. Victor C. Bell, M.D., with paranoid personality and delusional disorder.[21] *Winton Deposition* at Defendant's Exhibit 2, pp. 1-3. As recently as

---

[20] In the opinion of the court, Winton has been afforded ample opportunity for discovery.

[21] Dr. Bell dictated this report on February 7, 1992. *Winton Deposition* at Defendant's Exhibit 2, p. 3. On February 10, 1992, Dr. Bell dictated an addendum to his report, which stated,

Because of this patient's exemplary behavior on the ward, and his obvious control of himself and his ability to effectively understand sufficient reality to follow directions and be compliant with all requests, his air evacuation status has changed to category 1C. He requires no medication and has not required medication during his hospital stay. *Id.*

Winton attempts to put Dr. Bell's diagnosis at issue by his own affidavit and documentary evidence, filed September 17, 1997, which is the subject of GM's motion to strike, filed September 30, 1997. Winton testifies as follows: "Dr. Inouye's evaluation of three weeks disclosed none of the characteristics espoused by Dr. Bell; in fact Dr. Inouye indicated that the plaintiff was fit for duty." *Winton Affidavit II* at ¶ 51. Winton's documentary evidence consists of two pages from the same medical record submitted by GM and relied upon by GM. *Id.* at Exhibit T; *Winton Deposition* at Defendant's Exhibit 2, pp. 4-5. The first page, entitled "Home Care Instruction," is signed by Winton and dated March 9, 1992. *Id.* The second page, which appears to be a discharge summary, although the tile is illegible, is also dated March 9, 1992. *Id.* These pages indicate, "discharge diagnosis: None; discharge medications: None; follow-up: None." *Id.*

April 26, 1997, when Dr. Carol P. Walker conducted a court ordered neuropsychological evaluation, Winton exhibited characteristics consistent with Paranoid Personality Disorder. *Walker Declaration* at Exhibit A, p. 4. According to Dr. Bell, the "essential feature of this disorder," which Winton evinced during the April 26, 1997 evaluation, is "a pattern of distrust and suspiciousness." *Walker Declaration* at Exhibit A, p. 4. According to Dr. Bell, an individual with this disorder will "interpret the motives of others as hostile, even when they are not." *Id.* Since January, 1993, Winton has filed four other employment discrimination lawsuits against companies where he applied for employment; he has not obtained relief in any of them.

## II.  Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movants can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.

14

*Celotex,* 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex,* 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient

15

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 745 n.11(1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.   Discussion.

### A.   Claims under the ADEA.

Winton claims GM discriminated against him because of his age, as protected by the ADEA,[22] when it transferred him, terminated him and refused to rehire him. The ADEA

---

[22]The ADEA provides, in part:

It shall be unlawful for an employer—

16

prohibits an employer from discharging or otherwise discriminating against an employee on the basis of age, 29 U.S.C. § 623. Individuals who are at least 40 years of age, 29 U.S.C. § 631, may seek to establish a prima facie case in one of three ways: (1) by direct evidence of discriminatory intent; (2) by meeting the four-pronged test set out for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 688 (1973); or (3) through statistical proof. *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989).

Direct evidence, the conventional form of proof, is often the most difficult to muster. In *Carter v. City of Miami*, the Eleventh Circuit explained that discriminatory remarks had to specifically show discriminatory intent. *Carter*, 870 F.2d at 582. The *Carter* court stated that "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, . . . constitute direct evidence of discrimination." *Carter*, 870 F.2d at 582. Comments that are merely inappropriate and condescending are not recognized as direct evidence. *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 611 (11th Cir. 1987), *cert. denied*, 467 U.S. 1204 (1984). For example, the Eleventh Circuit held that direct evidence of a discriminatory nature existed where an experienced school principal and a superintendent of education testified "unequivocally" that racial motivation was present in the discharge of several school employees. *Lee v. Russell County Bd. of*

---

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this chapter. 29 U.S.C. § 623.

17

*Educ.*, 684 F.2d 769 (1982).   The Eleventh Circuit also found direct evidence of discrimination where a plaintiff and a union representative testified that an employer expressly stated that he refused to place the plaintiff in a certain job position because she was a woman. *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1553 (11th Cir. 1983), *cert. denied*, 467 U.S. 1204 (1984).

In the absence of direct evidence of discrimination, the plaintiff may rely upon the framework established in *McDonnell Douglas Corp. v. Green* and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L Ed. 2d 207 (1981). First, the plaintiff bears the burden of proving by a preponderance of the evidence a prima facie case of discrimination, *Burdine*, 450 U.S. at 253, which "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Id*. at 254.  Second, if the plaintiff carries his initial burden, the burden shifts to the defendant to rebut the presumption of illegal employment discrimination by articulating "some legitimate reason" for the employment decision at issue. *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802).  Finally, the plaintiff bears the burden of showing that the defendant's proffered reasons are pretextual or that discriminatory intent was more likely the cause of the employer's actions. *Burdine*, 450 U.S. at 253, 256.  Presentation of a prima facie case creates a rebuttable presumption of discrimination, but it does not alone establish a genuine issue of material fact sufficient to go to the jury. *Carter*, 870 F.2d at 585.  Because the plaintiff bears the burden of establishing pretext, once the defendant offers a legitimate, nondiscriminatory reason for an adverse employment action, the plaintiff must present significantly probative evidence on that  issue to avoid summary judgment.

*Id.* The plaintiff at all times retains the ultimate burden of persuading the trier of fact that the employer discriminated against the plaintiff. *Burdine*, 450 U.S. at 253.

To establish a prima facie case under the ADEA with circumstantial evidence, a plaintiff must prove: (1) that he is a member of the protected group; (2) that an adverse employment action was taken against him, e.g. discharge, demotion, or failure to hire or recall; (3) that the person hired was from outside the protected group; and (4) that he was qualified for the position for which he was rejected. *Carter*, 870 F.2d at 582 (citations omitted). The prima facie case requirement was "never intended to be rigid, mechanistic, or ritualistic." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L.Ed.2d 597 (1978). However, "[a] prima facie case may be established only when there is a basis for inferring that discrimination is the reason for the employment decision . . . " *Pace v. Southern Ry. Sys.*, 701 F.2d 1383, 1390 (11th Cir. 1983), *cert. denied*, 464 U.S. 1018 (1983).

Finally, the plaintiff may utilize statistical evidence, however statistics "are of relatively low importance in an individual disparate treatment case." *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1253 n.8 (7th Cir. 1990). The Eleventh Circuit has stated that "statistics alone cannot make a case of individual disparate treatment." *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984).

In this case, Winton alleges no facts as direct evidence or statistical evidence of age discrimination. Furthermore, Winton has not met his burden of establishing genuine issues of material fact upon which a reasonable jury could find a prima facie case of age discrimination based upon circumstantial evidence. Winton did establish the first, second and fourth elements of his prima facie case. First, Winton is a member of the protected

class, because he testifies, and GM does not dispute, that he was forty-one years old at the time of the alleged discrimination. Second, Winton suffered an adverse employment action when GM terminated his employment and refused to rehire him. Winton did not, however, establish that he suffered an adverse employment action when GM transferred him to various departments because he alleges no facts that support a finding that the transfers altered the terms and conditions of his employment. As to the fourth element, Winton established, and GM does not dispute that he is qualified for the positions from which he was transferred or terminated.

As to the third element of his prima facie case, Winton did not establish that the person hired to replace him was from outside his protected group. Winton did create a genuine issue as to whether, upon his transfer from the rack and pinion department to the pump area, GM replaced him with "an allegedly black twenty-six year-old." Winton also created a genuine issue as to whether, upon his transfer from the pump area to the valve department, GM replaced him with a "younger, less experienced" person. However, as stated above, Winton failed to establish that he suffered an adverse employment action with respect to these transfers.[23] Otherwise, Winton alleged no facts to support a conclusion that GM replaced him with a person from outside the protected group when it terminated him and refused to rehire him. Therefore, Winton can not establish the third element of his prima facie case of age discrimination as a matter of law.

---

[23] The evidence was that these were lateral transfers and that GM had a policy of transferring per diem supervisors in order to have them become familiar with all departments.

Even if Winton could establish a prima facie case of age discrimination with respect to his transfers, his termination and GM's refusal to rehire him, GM has proffered a legitimate non-discriminatory reason its decisions. First, GM proffered a legitimate non-discriminatory reason for Winton's transfer from the rack and pinion department to the pump area, employees in that department did not tolerate Winton's military-style supervision. Next, GM proffered a legitimate non-discriminatory reason for Winton's transfer from the pump area to the valve department, the valve department needed an additional per diem supervisor. Finally, GM states that it terminated Winton because of an unexcused absence from work and that it refused to rehire him when its investigation failed to substantiate Winton's claim that he arranged coverage before his departure. No genuine issue of fact exists as to GM's claims that employees in the rack and pinion department did not like Winton as a supervisor, or that GM needed an additional per diem supervisor in the valve department when it transferred Winton, or that Winton did not appear at work for over a week, or that he did not contact his supervisor about his absence, or that GM's investigation did not reveal any information to substantiate Winton's claim that he arranged coverage before his absence. Therefore, GM having established a legitimate non-discriminatory reason for its actions, the burden shifts to Winton to raise a genuine issue of fact as to GM's proffered reason.

Winton has failed to provide any evidence which would support a conclusion that GM's reasons for its decisions are pretext. The court has carefully searched the record, giving great deference to this *pro se* plaintiff, but to no avail in this regard. Therefore, construing all disputed facts in favor of Winton, no reasonable jury could conclude that

Winton's transfers, his discharge, or GM's decision not to rehire him were motivated by a discriminatory intent on the basis of age, as a matter of law.

Accordingly, Winton's claim of age discrimination is due to be dismissed on summary judgment.

### B.    Claims under Title VII and § 1981.

Winton claims GM discriminated against him because of race when it transferred him, terminated him and refused to rehire him. Winton's race discrimination claims are based upon two federal anti-discrimination laws, Title VII[24] and § 1981.[25] The elements and proof for a cause of action under § 1981 are identical to the elements of a Title VII claim. *Walters v. Atlanta*, 803 F.2d 1135 (11th Cir. 1986).

As with the ADA, a plaintiff may prove discrimination in an employment decision against him on the basis of race by direct evidence, circumstantial evidence, or statistical proof. Even if a Title VII plaintiff does not present direct evidence of discrimination, he

---

[24] Title VII provides, in part:

It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;  or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e(2).

[25] Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.  42 U.S.C. § 1981.

22

may nevertheless present sufficient circumstantial evidence of discrimination to create a jury question. In evaluating Title VII claims based on circumstantial evidence, the court uses the framework established by the United States Supreme Court in *McDonnell Douglas Corp, supra,* and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S. Ct. 1089, 67 L Ed. 2d 207 (1981).

Under that framework, as with the ADEA, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S. Ct. at 1824; *Burdine,* 450 U.S. at 253-54 & n. 6, 101 S. Ct. at 1093-94 & n. 6. Once a *prima facie* case has been established, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S. Ct. at 1824; *Burdine,* 450 U.S. at 254, 101 S. Ct. at 1094. To satisfy the burden of production, the defendant need not persuade the court that it was actually motivated by the proffered reasons, but must produce admissible evidence which would allow the trier of fact rationally to conclude the employment decision was not motivated by a discriminatory animus. *Burdine,* 450 U.S. at 254-55, 257, 101 S. Ct. at 1094, 1096. If a defendant carries its burden of producing legitimate, non-discriminatory reasons for its decision, the plaintiff is accorded the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id* . at 256, 101 S. Ct. at 1095.

23

The Eleventh Circuit has held that disbelief of the defendant's proffered reasons, together with the *prima facie* case, is sufficient circumstantial evidence to support a finding of discrimination. Therefore, "a plaintiff is entitled to survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997). Further, the Eleventh Circuit has held that once a plaintiff introduces evidence sufficient to permit the fact finder to disbelieve the employer's proffered explanations, summary judgment is inappropriate and the issues of fact and sufficiency of the evidence should be left to the jury. *Id*. at 1530. In summary, the Eleventh Circuit in *Combs* held "once a plaintiff has established a *prima facie* case and has put on sufficient evidence to allow a fact finder to disbelieve an employer's proffered explanation for its actions, that alone is enough to preclude entry of judgment as a matter of law." *Id*. at 1532.

In this case, Winton alleges no facts as direct evidence or statistical evidence of race discrimination. Winton offers evidence of many disparaging comments by his co-workers and workers that he supervised, both white and black, which were directed at him. Only one of these alleged comments mentions or implies any racial animus. This comment, by Winton's supervisor, McClanahan, according to Winton's affidavit, "indicated that he (McClanahan) had a problem with color." While this might be circumstantial evidence of racial animus, Winton does not allege, nor could any reasonable jury find, that McClanahan's comment directly indicates a racial motivation in any of GM's adverse

employment decisions. Therefore, Winton presents no direct or statistical evidence of discrimination on the basis of race.

Winton can, nevertheless, attempt to establish his claim for racial discrimination based upon circumstantial evidence. However, Winton has not met his burden of establishing genuine issues of material fact upon which a reasonable jury could find a prima facie case of race discrimination based upon circumstantial evidence either. First, as stated in the court's age discrimination analysis of this case, Winton did not allege any alterations in the terms and conditions of his employment when GM transferred him to various departments. Furthermore, with respect to any employment decisions made by GM, Winton did not present any circumstantial evidence of discriminatory intent. Winton did not allege or present evidence that a person hired to replace him was from another race. Winton did not allege or present evidence that GM treated employees of other races differently from him. The only circumstantial evidence of racial animus is Winton's affidavit testimony about McClanahan's "indication that he had a problem with color." No reasonable jury, even if it believed McClanahan made the comment, could find that this comment establishes discriminatory intent in GM's decision to transfer, terminate and not rehire Winton.    Therefore, Winton can not establish a prima facie case of race discrimination as a matter of law.

Although Winton does not specifically allege retaliation as part of his claim of racial discrimination, the court, in an effort to give great deference to the inartful pleading and briefing by this *pro se* plaintiff, will consider whether such a claim is sustainable. Winton's affidavit indicated  that his termination occurred while he was on a sojourn to file a

complaint of race discrimination in the federal district court for the Northern District of Virginia. However, Winton cannot establish a prima facie case of retaliation because the only evidence that GM might have even known about Winton's alleged reason for not reporting to work is Winton's testimony about McClanahan's vague comment, "I know what you're doing." No reasonable jury, even if it believed McClanahan made this comment and that this comment referred to Winton's alleged complaint of race discrimination, could conclude that this comment supports a claim of retaliatory discharge or retaliatory failure to rehire by GM. Therefore, Winton cannot establish a prima facie case of retaliation, as a matter of law.

Even if Winton could establish a prima facie case of race discrimination or retaliation, GM has proffered a legitimate non-discriminatory reason its decisions. GM proffered a legitimate non-discriminatory reason for Winton's transfers: Winton, having alienated those he supervised, needed a fresh start in a new department, and the valve department needed an additional per diem supervisor. As discussed previously, GM states that it terminated Winton because of an unexcused absence from work and that it refused to rehire him when its investigation failed to substantiate Winton's claim that he arranged coverage before his departure. No genuine issue exists as to the fact that those whom Winton supervised expressed a dislike for Winton's management style, that GM needed an additional per diem supervisor in the valve department, that Winton did not appear at work for over a week, that he did not contact his supervisor about his absence, and that GM's investigation did not reveal any information to substantiate Winton's claim that he arranged coverage before his departure. Therefore, GM having articulated a legitimate

non-discriminatory reason for its actions, the burden shifts to Winton to raise a genuine issue of fact as to GM's proffered reason.

Winton has failed to provide any evidence which would support a conclusion that GM's proffered reason for its decisions are pretext. The court has carefully search the record, giving great deference to this *pro se* plaintiff, but to no avail in this regard. Therefore, construing all disputed facts in favor of Winton, no reasonable jury could conclude that Winton's transfers, his discharge, or GM's decision not to rehire him were motivated by a discriminatory intent on the basis of race or retaliation for a complaint of race discrimination, as a matter of law.

Accordingly, Winton's claims of race discrimination are due to be dismissed on summary judgment.

### C.    Claims under the ADA.

Lastly, pursuant to the ADA,[26] Winton claims GM discriminated against him because of a disability when it transferred him, terminated him and refused to rehire him.  To establish a prima facie case of discriminatory discharge under the ADA, the plaintiff must establish that: (1) he has a disability, (2) he is a qualified individual, (3) and he is suffering discrimination because of his disability. 42 U.S.C. § 12112.

---

[26]The ADA provides, in part:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.  42 U.S.C. § 12112(a).

27

As to the first element, a disability, as defined by the statute, is a person with "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 121022(A). Winton has proffered no evidence of a disability. Winton, representing himself in a hearing on GM's Rule 12(b)(6) motion, argued before the court that he has a "heart condition." *Transcript of Hearing*, filed February 11, 1997, at 19. Winton told the court that, in August 1992, "there was [sic] three episodes of angina, which upon examination . . . [revealed] a third degree block, AV block." *Id.* at 20. Winton stated "there is a record of that . . . heart attack." *Id.* However, other than this dialogue with the court, the record is absolutely devoid of any evidence that Winton actually has a physical impairment,[27] much less that any such physical impairment limits a major life activity. Therefore, based upon the evidence before the court on summary judgment, no reasonable jury could conclude that Winton has a protected disability, as a matter of law.

As to the second element, a qualified individual, as defined by the statute, is a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 121022(A). All the evidence before the court on summary judgment indicates that Winton, without accommodation, could perform the essential functions of his job. Therefore, as a matter of law, Winton established the second element of his prima facie case.

---

[27]The record contains ample evidence that Winton suffered a mental impairment. However, Winton specifically stated to the court that he bases his ADA claim upon his "heart condition." *Transcript of Hearing*, filed February 11, 1997, at 17-22.

28

As to the last element, Winton alleges no facts and presents no evidence that he suffered discrimination because of his alleged disability. No evidence before the court on summary judgment indicates that GM or any of its decision makers even knew of Winton's alleged disability. Even if they knew of his alleged disability, Winton presents no evidence that GM took any adverse employment action or discriminated against him in any way because of his alleged disability. Therefore, construing all the evidence in a light most favorable to Winton, no reasonable jury could find that Winton has a protected disability or that he suffered discrimination because of an alleged disability, as a matter of law.

Accordingly, Winton's claim for discrimination in violation of the ADA is due to be dismissed on summary judgment.

## IV.    Conclusion.

Accordingly, the defendant's motion for summary judgment will be granted in its entirety, and this case is due to be dismissed with prejudice. Consequently, the defendant's motion to strike is moot. The court will enter an appropriate order in conformity with this memorandum opinion.

Done, this ___/8t___ of December, 1997.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

29